UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
OSCAR MARTÍNEZ, DODA CHÁVEZ, MIGUEL
GONZALES, JOSE CHOM, JOSE AGUILAR and on
behalf of all others similarly situated,

                                  Plaintiffs,

         -against-                             **COMPLAINT**

PPM GROUP LLC, PARISH PROPERTY
MANAGEMENT INC, PPM RESTORATION LLC,
PPM CONTRACTING, INC., and WILLIAM
O'CONNOR,

                                  Defendants.
-------------------------------------------------------------------X

## <u>PRELIMINARY STATEMENT</u>

1. Plaintiffs OSCAR MARTÍNEZ, DODA CHÁVEZ, MIGUEL GONZALES, JOSE
   CHOM and JOSE AGUILAR, on behalf of themselves (collectively as "Plaintiffs,"), and
   on behalf of all others similarly situated (collectively as "FLSA Plaintiffs," as that term
   is defined below), by and through his attorneys, EL-HAG & ASSOCIATES P.C. as and
   for his Complaint against PPM GROUP LLC; and as against PARISH PROPERTY
   MANAGEMENT INC; and as against PPM RESTORATION LLC; and as against PPM
   CONTRACTING (together, where appropriate, as "Corporate Defendants"); all working
   under the corporate banner of Parish Property Management; and individually against
   WILLIAM O'CONNOR (together, where appropriate, as "Defendants"), alleges upon
   knowledge as to himself and his own actions and upon information and belief as to all
   other matters as follows:

2. This is a civil action for damages and other redress based upon Defendants' willful
   violations of FLSA Plaintiffs' rights guaranteed by the overtime and minimum wage
   provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a), as well as
   violations of the New York Labor Law; and any other claims that can be inferred from
   the facts set forth herein.

3. Corporate Defendants own and operate a unified enterprise through Parish Property
   Management, which provides comprehensive facilities management services, including
   real estate transactions, master planning, construction management, and building

operations and maintenance. Parish Property Management also operates as a construction company specializing in interior renovations, exterior restoration, and new construction. Corporate Defendants primarily serve not-for-profit institutions, offering maintenance, property management, and real estate transaction services with professional staff experienced in addressing the unique needs of clients' facilities, including historic buildings.

4.  As described below, throughout the entirety of FLSA Plaintiffs employment, but as is relevant herein, for at least the last 6-year period pre-dating the commencement of this action ("the Relevant Time Period"), Defendants have willfully failed to pay FLSA Plaintiffs the overtime wages lawfully due to him under the FLSA.

5.  Specifically, during the Relevant Time Period, Defendants required the FLSA Plaintiffs to work more than 40 hours per week. However, Defendants failed to provide any compensation for hours worked beyond 40 in a workweek, in direct violation of the FLSA. Defendants did not pay the legally mandated overtime premium of 1.5 times the Plaintiffs' regular hourly rate and failed to compensate Plaintiffs for these hours in any manner. As a result, Defendants owe the Plaintiffs, and all similarly situated FLSA Plaintiffs, full payment for all hours worked over 40 per week, including the overtime premium required by law.

6.  Defendants failed to provide the Plaintiffs with a wage notice within 10-days of thier initial hire notifying them of his hourly rate, his overtime rate, and all other statutorily required information in violation of the FLSA and the NYLL.

7.  Defendants failed to provide Plaintiffs with any paystubs with each payment of wages set forth Plaintiff's hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages equivalent or similar whatsoever during his tenure of employment, in violation of the FLSA and NYLL.

8.  Defendants have applied the same unlawful pay practices to all workers at all locations under the control of Corporate Defendants.

9.  Accordingly, Plaintiffs brings this lawsuit against Defendants pursuant to the collective action provisions of the FLSA, 29 U.S.C. § 216(b), on behalf of themselves and on behalf of all other persons similarly situated during the applicable FLSA limitations period who have suffered damages because of Defendants' violations of the FLSA.

## <u>JURISDICTION AND VENUE</u>

10.  This action arises under Fair Labor Standards Act ("FLSA") 29 U.S.C. §201 et seq ; the New York Labor Law ("NYLL") § 652, NYLL § 191; NYLL § 215, NYLL § 198 1-b and NYLL § 198 1-d;  and NYLL §193.

11. This Court has original jurisdiction under 28 U.S.C. §1331, Federal Question, with reference to Plaintiff's FLSA claims. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 over all claims so related under the NYLL and the related regulations, as said claims form part of the same case or controversy pertaining to Plaintiff's FLSA claims.

12. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred within this judicial district.

## **THE PARTIES**

### **PLAINTIFFS**

13. Plaintiff OSCAR MARTÍNEZ, hereinafter ("Plaintiff Martinez") or ("Mr. Martinez"), resides at 211 Cleveland St. Port Chester, NY 10573.

14. Plaintiff DODA CHÁVEZ, hereinafter ("Plaintiff Chávez") or ("Mr. Chávez"), resides at 211 Cleveland St. Port Chester, NY 10573.

15. Plaintiff MIGUEL GONZALES, hereinafter ("Plaintiff Gonzales") or ("Mr. Gonzales"), resides at 440 West St. Port Chester, NY 10573.

16. Plaintiff JOSÉ AGUILAR, hereinafter ("Plaintiff Aguilar") or ("Mr. Aguilar"), resides at 61 Poningo St, Port Chester, NY 10573.

17. Plaintiff JOSE CHOM, hereinafter ("Plaintiff Chom") or ("Mr. Chom"), resides at 73 Smith St., Port Chester, NY 10573.

18. Plaintiff Martínez, Plaintiff Chávez, Plaintiff Gonzales, Plaintiff Chom, and Plaintiff Aguilar will jointly be referred to herein as ("Plaintiffs").

### **DEFENDANTS**

19. Defendant PPM GROUP LLC, hereinafter ("Defendant PPM Group") or ("PPM Group"), is a domestic limited liability company doing business in the State of New York at 11 Seventh Street, Pelham, NY 10803.

20. Defendant PPM Group performed one or more of the following actions while the Plaintiffs were working for the Defendants: (1) hired the Plaintiffs, (2) terminated the employment of the Plaintiffs, (3) set the wage rate of Plaintiffs, (4) maintained payroll records concerning the Plaintiffs, or (5) instituted work rules for the Plaintiffs.

21. Defendant PARISH PROPERTY MANAGEMENT INC., hereinafter ("Defendant Parish Property") or ("Parish Property") is a domestic business corporation doing business in the State of New York at 11 Seventh Street, Pelham, NY 10803.

22. Defendant Parish Property performed one or more of the following actions while the Plaintiffs were working for the Defendants: (1) hired the Plaintiffs, (2) terminated the employment of the Plaintiffs, (3) set the wage rate of Plaintiffs, (4) maintained payroll records concerning the Plaintiffs, or (5) instituted work rules for the Plaintiffs.

23. Defendant, PPM RESTORATION LLC, hereinafter ("Defendant PPM Restoration") or ("PPM Restoration"), is a domestic limited liability company doing business in the State of New York at 11 Seventh Street, Pelham, NY 10803.

24. Defendant PPM Restoration performed one or more of the following actions while the Plaintiffs were working for the Defendants: (1) hired the Plaintiffs, (2) terminated the employment of the Plaintiffs, (3) set the wage rate of Plaintiffs, (4) maintained payroll records concerning the Plaintiffs, or (5) instituted work rules for the Plaintiffs.

25. Defendant, PPM CONTRACTING, INC. hereinafter ("Defendant PPM Contracting") or ("PPM Contracting") is a domestic business corporation doing business in the State of New York at 35 E Grassy Sprain Road #504, Yonkers, NY, 10710.

26. Defendant PPM Contracting performed one or more of the following actions while the Plaintiffs were working for the Defendants: (1) hired the Plaintiffs, (2) terminated the employment of the Plaintiffs, (3) set the wage rate of Plaintiffs, (4) maintained payroll records concerning the Plaintiffs, or (5) instituted work rules for the Plaintiffs.

27. Defendant WILLIAM O'CONNOR, hereinafter ("Defendant O'Connor") or ("Mr. O'Connor"), owns all or part of Parish Property and acts as the CEO, with his principal place of business at 11 Seventh Street, Pelham, NY 10803.

28. Defendant O'Connor performed one or more of the following actions while the Plaintiffs were working for the Defendants: (1) hired the Plaintiffs, (2) terminated the employment of the Plaintiffs, (3) set the wage rate of Plaintiffs, (4) maintained payroll records concerning the Plaintiffs, or (5) instituted work rules for the Plaintiffs.

29. Defendant PPM Group, Defendant Parish Property, Defendant PPM Restoration, Defendant PPM Contracting, and Defendant O'Connor will jointly be referred to herein as ("Defendants").

## SINGLE INTEGRATED ENTERPRISE

30. Defendant O'Connor operated a single integrated enterprise by maintaining control over the following entities: Defendant PPM Group, Defendant Parish Property, Defendant

PPM Restoration, and Defendant PPM Contracting, collectively referred to as ("Corporate Defendants"). The Corporate Defendants were under common ownership and financial control, with Defendant O'Connor acting as the President of all of them.



Figure 1. Executive Leadership Team of PPM Group: William (Bill) O'Connor portrayed as President of Parrish Property Management Group. Retrieve from: https://ppmgroup.net/staff



Figure 2. Executive Leadership Team of PPM Restoration: William (Bill) O'Connor portrayed as President of Parrish Property Management Group. Retrieve from: http://www.ppmrestoration.com/about.html

5



Figure 3. Executive Leadership Team of PPM: William (Bill) O'Connor portrayed as President of Parrish Property Management Group. Retrieve from: https://parishmgt.com/our-staff

31. All Corporate Defendants operated collectively under the trade name "Parish Property Management" or "PPM" presenting themselves as a unified business entity to clients and the public.

32. Plaintiffs were tasked with constructing, repairing, and maintaining structures composed of brick, stone, concrete, and similar materials. Their responsibilities included preparing worksites, mixing mortar or concrete, and laying bricks or stones in strict accordance with architectural plans and specifications.

33. Corporate Defendants routinely transferred and rotated employees between projects and operations across their various entities. These assignments were made without altering the employees' working conditions, hours, or pay rates.

34. Corporate Defendants frequently issued payments to Plaintiffs through multiple corporate entities. However, these payments did not reflect any change to the Plaintiffs' employment conditions, such as job duties, pay rates, or hours worked, reinforcing the single enterprise nature of Defendants' operations.

35. All tasks performed by Plaintiffs and their coworkers directly supported the cohesive functioning of the Corporate Defendants' integrated enterprise.

36. Upon information and belief, Corporate Defendants systematically applied unlawful pay practices by requiring employees to work in excess of forty (40) hours per week without paying the legally mandated overtime rate, in blatant violation of the New York Labor Law (NYLL). Moreover, Defendants failed to provide employees with wage notices within ten (10) days of hire and neglected to issue paystubs, further compounding their violations of the NYLL.

37. Upon information and belief, Plaintiffs and all similarly situated FLSA Plaintiffs were required to begin their workday at 6:30 AM. Failure to comply with this schedule resulted in disciplinary action, including being sent home without pay. Plaintiffs were also required to remain on duty until 6:30 PM, as their workday extended beyond regular tasks to include returning to Defendants' headquarters at 11 Seventh Street, Pelham, NY 10803, to unload leftover materials and tools from the day. Despite working these extended hours, Defendants consistently informed Plaintiffs and FLSA Plaintiffs that their paid schedule was limited to 8:00 AM to 4:00 p.m., depriving them of compensation for substantial additional hours worked daily.

38. Upon information and belief, the Corporate Defendants shared managerial staff across their operations to maintain control over their unified enterprise. For instance, Manager Lucia Tania, Julia O'Connor (Human Resources), Theresa Spina (Vice President of Operations), and Deneise Davy (Administrator) oversaw multiple projects and entities within the Corporate Defendants' operations without disrupting the continuity of business activities.

39. Upon information and belief, the Corporate Defendants operated as a single integrated enterprise under the control of William O'Connor, who is listed as the registered agent and/or CEO for multiple entities, including PPM Group LLC, Parish Property Management, Inc., and PPM Restoration LLC. All Corporate Defendants shared common ownership, management, and operational functions.

40. The Corporate Defendants engage in overlapping and interdependent business activities. For example, Parish Property Management, Inc. provides facilities management, real estate transaction services, and property management to institutions, including historic and non-profit organizations. PPM Restoration LLC specializes in construction services, such as interior renovations, exterior restoration, and new construction. Meanwhile, PPM Group LLC functions as a coordinating entity, supporting and integrating the operations of all affiliated companies.

41. The Corporate Defendants maintain their principal business addresses at 11 Seventh Street, Pelham, NY 10803, as reflected in their filings with the Department of State, further evidencing their unified operations and centralized control.



Figure 4. Screenshot of Defendant PPM Group's Entity Information, retrieved from the Department of State Division of Corporations website on December. 24, 2024



Figure 5. Screenshot of Defendant Parish Property Management's Entity Information, retrieved from the Department of State Division of Corporations website on December. 24, 2024



Figure 6. Screenshot of Defendant Parish PPM Restoration's Entity Information, retrieved from the Department of State Division of Corporations website on December. 24, 2024



Figure 7. Screenshot of Defendant Parish PPM Contracting's Entity Information, retrieved from the Department of State Division of Corporations website on December. 24, 2024

## <u>COLLECTIVE ACTION ALLEGATIONS</u>

42. Plaintiffs seek to bring this suit to recover from Corporate Defendants unpaid overtime compensation and liquidated damages pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 216(b), collective, on their own behalf, as well as on behalf of those in the following collective:

43. "Current and former employees, who during the applicable limitations period, performed any work for Defendants as construction or maintenance employees, including but not limited to,1) drivers; 2) mason; 3) foreman; 4) machine operators or; 5) or any other similarly situated employees who worked in another similar position, and who consent to file a claim to recover unpaid overtime compensation and liquidated damages that are legally due to them ("FLSA Plaintiffs")."

44. Corporate Defendants have treated the Plaintiffs and all FLSA Plaintiffs similarly in that Plaintiff and all FLSA Plaintiffs have: (1) performed similar tasks, as described in the "Background Facts" section below; (2) have been subject to the same laws and regulations; (3) have been paid in the same or similar manner; (4) have been required to work in excess of forty hours in a workweek; and (5) have not been paid the required one and one-half times their respective regular rates of pay for all hours worked per workweek in excess of forty.

45. At all times during the Relevant Time Period, Defendants are and have been aware of the requirement to pay Plaintiffs and all FLSA Plaintiffs at an amount equal to the rate of one and one-half times their respective regular rates of pay for all hours worked each workweek above forty, yet they purposefully and willfully have chosen and continue to choose not to do so.

46. Plaintiffs and all similarly situated FLSA Plaintiffs were required to begin their workday at 6:30 AM. Failure to comply with this schedule resulted in disciplinary action, including being sent home without pay. Plaintiffs were also required to remain on duty until 6:30 PM, as their workday extended beyond regular tasks to include returning to Defendants' headquarters at 11 Seventh Street, Pelham, NY 10803, to unload leftover materials and tools from the day. Despite working these extended hours, Defendants consistently informed Plaintiffs and FLSA Plaintiffs that their paid schedule was limited to 8:00 AM to 4:00 PM, depriving them of compensation for substantial additional hours worked daily.

47. Indeed, Plaintiff and some FLSA Plaintiffs have lodged numerous complaints to Corporate Defendants throughout their employment that Defendants are not paying them overtime compensation in accordance with the law. Defendants have not only continued not to do so, but they have threatened Plaintiff and some FLSA Plaintiffs that if they

documented working any hours beyond forty in a week, then they would not receive their paychecks.

48. Thus, Plaintiff and all FLSA Plaintiffs are victims of Corporate Defendants' pervasive practice of willfully refusing to pay their employees overtime compensation for all hours worked per workweek above forty hours per week, in violation of the FLSA employee work conditions.

## ENGAGED IN INTERSTATE COMMERCE

49. Plaintiffs and their similarly situated coworkers engaged in commerce, or in the production of goods for commerce, through the handling of goods and materials that have moved in or been produced for commerce. Plaintiffs were responsible for receiving, transporting, and distributing construction materials, including paint, tools, sealants, hardware, and equipment used in construction and maintenance projects that crossed state lines and were produced for sale or use in the United States.

50. Corporate Defendants engaged in interstate commerce by purchasing goods and materials produced for commerce. These materials included construction supplies, paint, tools, sealants, and other equipment that were shipped across state lines for use in construction and maintenance projects within New York State.

51. Corporate Defendants, both individually and collectively, operate as enterprises whose annual gross volume of sales or business exceeds $500,000.00. Corporate Defendants employ approximately 50 or more workers across multiple locations and provide maintenance, real estate transaction services, and property management to not-for-profit institutions throughout New York City and Westchester County.

52. As an enterprise with annual gross sales exceeding $500,000.00 and engaged in interstate commerce through the purchase and handling of materials that crossed state lines, Corporate Defendants are subject to the overtime wage requirements of the Fair Labor Standards Act (FLSA). This applies to all employees, including Plaintiffs and all similarly situated FLSA Plaintiffs, as Defendants' employees regularly engaged in activities that qualify as commerce under the FLSA.

## BACKGROUND FACTS

53. Parish Property Management provides comprehensive facilities management services, including real estate transactions, master planning, construction management, and building operations and maintenance. Parish Property Management operates as a construction company specializing in interior renovations, exterior restoration, and new construction. Parish Property Management primarily serves not-for-profit institutions,

offering maintenance, property management, and real estate transaction services. Its professional staff has decades of experience addressing the unique needs of clients' facilities, including historic buildings.

54. Plaintiffs performed their work at the Corporate Defendants' principal location, located at 11 Seventh Street, Pelham, NY 10803.



Figure 8. Location where Plaintiffs worked.

## PLAINTIFF MARTINEZ

55. Defendants hired Plaintiff Martinez as a w2 non-exempt wage earner on December 1, 2021.

56. Plaintiff stopped working for Defendants on July 3, 2024.

57. Defendants hired Plaintiff Martinez as a mason; he was responsible for creating structures out of bricks, concrete, and natural stones. He was mason until January 1, 2023.

58. From February 1, 2023, to July 3, 2024, Plaintiff Martinez was a delivery driver, responsible for transporting construction materials to different locations.

## WORK SCHEDULE HISTORY FOR PLAINTIFF MARTINEZ

59. Between December 2021 to January 31, 2023, Plaintiff Martinez's general work schedule was as follows:

| Day | Start Time | End Time | Total |
|---|---|---|---|
| Sunday | OFF | OFF | OFF |
| Monday | 06:30 AM | 6:30 PM | 12 Hours |
| Tuesday | 06:30 AM | 6:30 PM | 12 Hours |
| Wednesday | 06:30 AM | 6:30 PM | 12 Hours |

| | | | |
|---|---|---|---|
| Thursday | 06:30 AM | 6:30 PM | 12 Hours |
| Friday | 06:30 AM | 6:30 PM | 12 Hours |
| Saturday | OFF | OFF | OFF |
| | | **Total Hours** | **60 Hours** |

60. Between February 2023 to July 3, 2024, Plaintiff Martinez's general work schedule was as follows:

| Day | Start Time | End Time | Total |
|---|---|---|---|
| Sunday | OFF | OFF | OFF |
| Monday | 06:30 AM | 6:30 PM | 12 Hours |
| Tuesday | 06:30 AM | 6:30 PM | 12 Hours |
| Wednesday | 06:30 AM | 6:30 PM | 12 Hours |
| Thursday | 06:30 AM | 6:30 PM | 12 Hours |
| Friday | 06:30 AM | 6:30 PM | 12 Hours |
| Saturday | OFF | OFF | OFF |
| | | **Total hours** | **60 hours** |

## **FAILURE TO PROVIDE WAGE NOTICE FOR PLAINTIFF MARTINEZ**

61. The New York State Department of Labor required the Defendants to provide Plaintiff Martinez with wage notice within 10 days of his initial date of his employment that is equivalent or similar to the standard forms provided by the NYS DOL in Figure 9.

62. Withing ten (10) days of Plaintiff Martinez first day of work, Defendants failed to provide Plaintiff Martinez with a written notice in Plaintiff Martinez native language of Spanish containing the following information:

    i.   whether paid by the hour, shift, day, week, salary, piece, commission or other allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;

    ii.  the regular pay designated by the employer in accordance with NYLL §191;

    iii. the name of the employer;

    iv.  Any "doing business as" names used by the employer;

    v.   The physical address of the employer's main office or principal place of business and a mailing address, if different;

    vi.  The telephone number of the employer.



Figure 9. NY Department of Labor required wage notice.

## FAILURE TO PROVIDE PAYSTUBS FOR PLAINTIFF MARTINEZ

63. The New York State Department of Labor required the Defendants to provide Plaintiff Martinez with a pay stub with each payment of wages set forth Plaintiff Martinez's hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages equivalent or similar to the standard forms provided by the NYS DOL in Figure 10.



Figure 10. NY Dept. of Labor Example Proper Paystub.

64. The Defendants failed to provide Plaintiff Martinez with an accurate statement of wages with each payment of wages that set forth Plaintiff Martinez hours worked, rates of pay,

14

gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages.

65. Instead of providing a paystub each week, Defendants paid Plaintiff Martinez by check for all hours worked. Throughout Plaintiff Martinez's employment, Defendants failed to provide him with pay stubs, as required by the New York State Labor Law as follows.

## PAY HISTORY OF PLAINTIFF MARTINEZ

66. From December 1, 2021, to January 31, 2023, the Defendants paid Plaintiff Martinez an hourly rate of $25.00 regardless of the hours he worked.

67. Between February 1, 2023, to January 31, 2024, the Defendants paid Plaintiff Martinez an hourly rate of $28.00 regardless of the hours he worked.

68. From February 1, 2024, to July 3, 2024, the Defendants paid Plaintiff Martinez an hourly rate of $30.00 regardless of the hours he worked.

## UNPAID OVERTIME CLAIMS OF PLAINTIFF MARTINEZ

69. Defendants failed to pay Plaintiff Martinez an overtime premium equal to 1.5x Plaintiff Martinez's regular rate for all the hours worked over 40 per week.

70. Rather than paying Plaintiff Martinez the required overtime premium of 1.5 times his regular hourly rate for hours worked more than 40 per week, Defendants compensated all hours, including overtime, at the standard straight-time rate.

71. Defendants owe Plaintiff Martinez the difference between the regular hourly rate and the legally required overtime rate for all hours worked beyond 40 in a workweek.

72. Defendants engaged in this unlawful payment practice during Plaintiff Martinez's whole tenure of employment.

73. As such, the Defendants failed to pay Plaintiff Martinez $108,660.00 in unpaid overtime wage, as set forth in Figure 11.

| Period start | Period end | Weeks in period | Regular hourly rate | Average Total hours worked per | Regular hours worked per week | Average overtime worked per week | Proper overtime rate per hour | Unpaid Overtime per hour | Unpaid overtime pay per week | Unpaid overtime in period | Total unpaid wages in period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| December 1, 2021 | December 31, 2021 | 4 | $ 25.00 | 60 | 40 | 20 | $ 37.50 | $ 37.50 | $ 750.00 | $ 3,214.29 | $ 3,214.29 |
| January 1, 2022 | December 31, 2022 | 52 | $ 25.00 | 60 | 40 | 20 | $ 37.50 | $ 37.50 | $ 750.00 | $ 39,000.00 | $ 39,000.00 |
| January 1, 2023 | January 31, 2023 | 4 | $ 25.00 | 60 | 40 | 20 | $ 37.50 | $ 37.50 | $ 750.00 | $ 3,214.29 | $ 3,214.29 |
| February 1, 2023 | December 31, 2023 | 48 | $ 28.00 | 60 | 40 | 20 | $ 42.00 | $ 42.00 | $ 840.00 | $ 39,960.00 | $ 39,960.00 |
| January 1, 2024 | January 31, 2024 | 4 | $ 28.00 | 60 | 40 | 20 | $ 42.00 | $ 42.00 | $ 840.00 | $ 3,600.00 | $ 3,600.00 |
| February 1, 2024 | July 3, 2024 | 22 | $ 30.00 | 60 | 40 | 20 | $ 45.00 | $ 45.00 | $ 900.00 | $ 19,671.43 | $ 19,671.43 |
| | | | | | | | | **Total** | | **$ 108,660.00** | **$ 108,660.00** |

Figure 11. Calculation of Unpaid Overtime for the Plaintiff Martinez.

## FALSE ALLEGATIONS AND WRONGFUL TERMINATION AS TO PLAINTIFF MARTINEZ, CHAVEZ AND GONZALES

74. In late June 2024, Plaintiff Martinez worked as a delivery driver for Defendants, responsible for purchasing and transporting construction materials for various company projects. Plaintiff Martinez's job often required him to manage up to six deliveries in a single day, a demanding role he handled with consistent responsibility and efficiency.

75. On June 29, 2024, Plaintiff Martinez delivered 36 containers of roofing sealant to the Marymount Convent site at 32 Warren Ave, Tarrytown, NY 10591 (hereinafter "Marymount"). The foreman, Alberto (also known on information and belief as "Adin Gonzales"), confirmed and signed off on the delivery, ensuring the materials were received in full.



Figure 12. Roofing Sealant Container Used in Project Sites.

76. Shortly thereafter, another project site, St. Clare Friary at 110 Shonnard Place (hereinafter "St. Clare"), requested ten containers of roofing sealant to be transferred from the Marymount site. Such internal transfers were routine and typically organized by foremen to prevent excess purchases. Plaintiff Gonzales was instructed to retrieve ten containers of roofing sealant from Marymount and deliver them to the St. Clare project.

77. Upon arriving at Marymount, Plaintiff Gonzales was informed by Foreman Alberto that only four containers were available, as the remaining materials were needed for ongoing work at Marymount. Following these instructions, Plaintiff Gonzales complied and delivered the four containers to St. Clare as directed.

78. Not long after, a dispute arose: allegations were made that only three or four containers of roofing sealant had arrived at St. Clare instead of the requested seven. Plaintiff Martinez had no involvement in this transfer. His job had ended when he delivered all 36 containers to Marymount, as confirmed by the foreman, Alberto.

79. Defendants' accusations, however, extended far beyond reason. They included Plaintiff Chavez, who was working at an entirely different project site at the time and had no connection to the materials. His only apparent "involvement" was being the father of Jose Chavez, another accused employee, and the father-in-law of Plaintiff Martinez. This made clear that the accusations were not based on evidence but on reckless assumptions and biases.

80. Despite having no evidence and failing to investigate the claims, Defendants accused Plaintiff Martinez, Plaintiff Gonzales, Jose Chavez, Yonni Bonilla, and Plaintiff Chavez of stealing the missing containers.

81. On July 3, 2024, manager Tania Lucia ("Ms. Lucia") called the accused employees into a meeting with other managers, including Francisco Arruguetagui and William Kellehr. The meeting was hostile from the start. Ms. Lucia immediately accused the group of theft, demanding, "Where did you divert the materials?" and "Where did you sell them?" Plaintiff Gonzales responded that he had no idea what she was talking about, but Ms. Lucia dismissed his response and continued to accuse everyone without presenting any proof.

82. Ms. Lucia then escalated the accusations, declaring, "We're missing some buckets of sealant, and you all have them," before resorting to intimidation. She threatened, "If the materials don't show up, we'll call immigration and the police and let them handle this." This statement was clearly intended to scare and coerce the employees, leveraging their immigration status to force confessions to something they did not do.

83. Despite this blatant intimidation, every employee denied the allegations. Plaintiff Martinez responded firmly, "You can investigate me all you want, but I haven't taken any materials. I'm clean."

84. Plaintiffs denied the allegations. Moreover, Plaintiff Gonzales specifically explained that the containers he delivered to St. Clare were the four provided to him by Foreman Alberto at Marymount. Despite this clarification, Ms. Lucia and the other managers participating in the meeting asserted that Foreman Alberto had reported releasing all ten containers from Marymount, contradicting Plaintiff Gonzales's account.

85. Despite presenting no evidence to support their claims, the managers, including Ms. Lucia, dismissed the Plaintiffs' denials outright. Ms. Lucia ended the meeting with the statement, "I'll give you some time to think things over," a thinly veiled threat designed to pressure the employees into admitting to actions they did not commit.

86. When none of the employees "confessed," Ms. Lucia and the other managers retaliated. Without conducting any investigation or providing a valid reason, Defendants immediately terminated Plaintiff Martínez, Plaintiff Gonzales, Plaintiff Chavez, Jose Chavez, and Yonni Bonilla.

87. On July 3, 2024, Manager Tania Lucia publicly accused Plaintiffs and other employees of theft in a message sent to the company's WhatsApp group. (Ex. 1_2024_Manager Tania's Message in the Company Group Chat)

88. In her message, Ms. Lucia announced that Plaintiffs Martinez, Chavez and Gonzales and both individuals, José Manuel Chavez and Yonni Bonilla, Doda Chavez, were terminated due to "alleged theft." This public accusation was made without any evidence, investigation, or prior notice to the Plaintiffs, tarnishing their reputations within the company.

89. Ms. Lucia further emphasized the "serious consequences" the alleged theft would bring to the company, heightening the public nature of the accusation and amplifying its impact on the Plaintiffs' professional and personal reputations.

90. By publicly broadcasting these baseless allegations in a group chat shared by all employees, Defendants subjected the Plaintiffs to humiliation, reputational harm, and undue stress, in addition to wrongfully terminating them without justification.

## PLAINTIFF CHAVEZ BACKGROUND FACTS

91. Defendants hired Plaintiff Chavez as a w2 non-exempt wage earner on December 20, 2021.

92. Plaintiff stopped working for Defendants on July 3, 2024.

93. Defendants hired Plaintiff Chavez as a Mason; he was responsible for creating structures out of bricks, concrete, and natural stones.

## WORK SCHEDULE HISTORY OF PLAINTIFF CHAVEZ

94. Between December 20, 2021, and July 3, 2024, Plaintiff Chavez's general work schedule was as follows:

| Day | Start Time | End Time | Total |
|---|---|---|---|
| Sunday | OFF | OFF | OFF |
| Monday | 06:30 AM | 6:00 PM | 11.5 Hours |
| Tuesday | 06:30 AM | 6:00 PM | 11.5 Hours |
| Wednesday | 06:30 AM | 6:00 PM | 11.5 Hours |
| Thursday | 06:30 AM | 6:00 PM | 11.5 Hours |
| Friday | 06:30 AM | 6:00 PM | 11.5 Hours |

| Saturday | OFF | OFF | OFF |
|---|---|---|---|
| | | **Total Hours** | **57.5 Hours** |

## FAILURE TO PROVIDE WAGE NOTICE TO PLAINTIFF CHAVEZ

95. The New York State Department of Labor required the Defendants to provide Plaintiff Chavez with wage notice within 10 days of his initial date of his employment that is equivalent or similar to the standard forms provided by the NYS DOL in Figure 13.

96. Withing ten (10) days of Plaintiff Chavez's first day of work, Defendant failed to provide Plaintiff Chavez with a written notice in Plaintiff Chavez's native language of Spanish containing the following information:

   i.whether paid by the hour, shift, day, week, salary, piece, commission or other allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;

  ii.the regular pay designated by the employer in accordance with NYLL §191;

 iii.the name of the employer;

 iv.Any "doing business as" names used by the employer;

  v.The physical address of the employer's main office or principal place of business and a mailing address, if different;

 vi.The telephone number of the employer.



1.

Figure 13. NY Department of Labor required wage notice.

## FAILURE TO PROVIDE PAYSTUBS TO PLAINTIFF CHAVEZ

97. The New York State Department of Labor required the Defendants to provide Plaintiff Chavez with a pay stub with each payment of wages set forth Plaintiff Chavez's hours

worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages equivalent or similar to the standard forms provided by the NYS DOL in Figure 14.



Figure 14. NY Dept. of Labor Example Proper Paystub.

98. The Defendants failed to provide Plaintiff Chavez with an accurate statement of wages with each payment of wages that set forth Plaintiff Chavez hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages.

99. Instead of providing a paystub each week, Defendants paid Plaintiff Chavez by check. Defendants failed to provide him with pay stubs, as required by the New York State Labor Law as follows.

**PAY HISTORY OF PLAINTIFF CHAVEZ**

100. From December 20, 2021, to December 31. 2021, the Defendants paid Plaintiff Chavez an hourly rate of 28.00 regardless of the hours he worked.

101. From January 1, 2022, to July 3, 2024, the Defendants paid Plaintiff Chavez an hourly rate of 30.00 regardless of the hours he worked.

**UNPAID OVERTIME CLAIMS OF PLAINTIFF CHAVEZ**

102. Defendants failed to pay Plaintiff Chavez an overtime premium equal to 1.5x Plaintiff Chavez's regular rate for all the hours worked over 40 per week.

103. Rather than paying Plaintiff Chavez the required overtime premium of 1.5 times her regular hourly rate for hours worked more than 40 per week, Defendants compensated all hours, including overtime, at the standard straight-time rate.

104. Defendants owe Plaintiff Chavez the difference between the regular hourly rate and the legally required overtime rate for all hours worked beyond 40 in a workweek.

105. Defendants engaged in this unlawful payment practice during Plaintiff Chavez's whole tenure of employment.

106. As such, the Defendants failed to pay Plaintiff Chavez $118,577.14 in unpaid overtime wage, as set forth in Figure 15.

| Period start | Period end | Weeks in period | Regular hourly rate | Average Total hours worked per | Regular hours worked per week | Average overtime worked per week | Proper overtime rate per hour | Unpaid Overtime per hour | Unpaid overtime pay per week | Unpaid overtime in period | Total unpaid wages in period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| December 20, 2021 | December 31, 2021 | 2 | $ 28.00 | 60 | 40 | 20 | $ 42.00 | $ 42.00 | $ 840.00 | $ 1,320.00 | $ 1,320.00 |
| January 1, 2022 | December 31, 2022 | 52 | $ 30.00 | 60 | 40 | 20 | $ 45.00 | $ 45.00 | $ 900.00 | $ 46,800.00 | $ 46,800.00 |
| January 1, 2023 | December 31, 2023 | 52 | $ 30.00 | 60 | 40 | 20 | $ 45.00 | $ 45.00 | $ 900.00 | $ 46,800.00 | $ 46,800.00 |
| January 1, 2024 | July 3, 2024 | 26 | $ 30.00 | 60 | 40 | 20 | $ 45.00 | $ 45.00 | $ 900.00 | $ 23,657.14 | $ 23,657.14 |
| | | | | | | | | | Total | $ 118,577.14 | $ 118,577.14 |

Figure 15. Calculation of Unpaid Overtime for the Plaintiff Chavez

## PLAINTIFF GONZALES BACKGROUND FACTS

107. Defendants hired Plaintiff Gonzales as a w2 non-exempt wage earner on November 22, 2024.

108. Plaintiff Gonzales stopped working for Defendants on July 03, 2024.

109. Defendants hired Plaintiff Gonzales as a delivery driver, and he was responsible for transporting the materials of constructions to the different locations.

## WORK SCHEDULE HISTORY OF PLAINTIFF GONZALES

110. Between November 22, 2021, to July 3, 2024, Plaintiff Gonzales's general work schedule was as follows:

| Day | Start Time | End Time | Total |
|---|---|---|---|
| Sunday | OFF | OFF | OFF |
| Monday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Tuesday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Wednesday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Thursday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Friday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Saturday | OFF | OFF | OFF |
| | | **Total Hours** | **47.5 Hours** |

## **FAILURE TO PROVIDE WAGE NOTICE TO PLAINTIFF GONZALES**

111. The New York State Department of Labor required the Defendants to provide Plaintiff Gonzales with wage notice within 10 days of his initial date of his employment that is equivalent or similar to the standard forms provided by the NYS DOL in Figure 16.

112. Withing ten (10) days of Plaintiff Gonzales's first day of work, Defendant failed to provide Plaintiff with a written notice in Plaintiff's native language of Spanish containing the following information:

    i.   whether paid by the hour, shift, day, week, salary, piece, commission or other allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;

    ii.   the regular pay designated by the employer in accordance with NYLL §191;

    iii.   the name of the employer;

    iv.   Any "doing business as" names used by the employer;

    v.   The physical address of the employer's main office or principal place of business and a mailing address, if different;

    vi.   The telephone number of the employer.



Figure 16. NY Department of Labor required wage notice.

## **FAILURE TO PROVIDE PAYSTUBS TO PLAINTIFF GONZALES**

113. The New York State Department of Labor required the Defendants to provide Plaintiff Gonzales with a pay stub with each payment of wages set forth Plaintiff Gonzales's hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any,

deductions, and net wages equivalent or similar to the standard forms provided by the NYS DOL in Figure 17.



Figure 17. NY Dept. of Labor Example Proper Paystub

114. The Defendants failed to provide Plaintiff Gonzales with an accurate statement of wages with each payment of wages that set forth Plaintiff Gonzales hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages.

115. Instead of providing a paystub each week, Defendants paid Plaintiff Gonzales in cash for all hours worked. The cash was delivered by check. Throughout Plaintiff Gonzales's employment, Defendants failed to provide him with pay stubs, as required by the New York State Labor Law as follows.

## PAY HISTORY OF PLAINTIFF GONZALES

116. From November 22, 2021, to July 3, 2024, Defendants paid Plaintiff Gonzales an hourly rate of $31.50 regardless of the hours he worked.

## FAILURE TO PAY OVERTIME TO PLAINTIFF GONZALES

117. Defendants failed to pay Plaintiff Gonzales an overtime premium equal to 1.5x the Plaintiff's regular rate for all the hours worked over 40 per week.

118. Rather than paying Plaintiff Gonzales the required overtime premium of 1.5 times her regular hourly rate for hours worked more than 40 per week, Defendants compensated all hours, including overtime, at the standard straight-time rate.

119. Defendants owe Plaintiff Gonzales the difference between the regular hourly rate and the legally required overtime rate for all hours worked beyond 40 in a workweek.

120. Defendants engaged in this unlawful payment practice during Plaintiff Gonzales's whole tenure of employment.

121. As such, the Defendants failed to pay Plaintiff Gonzales $128,385.00 in unpaid overtime wage, as set forth in Figure 18.

| Period start | Period end | Weeks in period | Regular hourly rate | Average Total hours worked per | Regular hours worked per week | Average overtime worked per week | Proper overtime rate per hour | Unpaid Overtime per hour | Unpaid overtime pay per week | Unpaid overtime in period | Total unpaid wages in period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| November 22, 2021 | December 31, 2021 | 6 | $ 31.50 | 60 | 40 | 20 | $ 47.25 | $ 47.25 | $ 945.00 | $ 5,265.00 | $ 5,265.00 |
| January 1, 2022 | December 31, 2022 | 52 | $ 31.50 | 60 | 40 | 20 | $ 47.25 | $ 47.25 | $ 945.00 | $ 49,140.00 | $ 49,140.00 |
| January 1, 2023 | December 31, 2023 | 52 | $ 31.50 | 60 | 40 | 20 | $ 47.25 | $ 47.25 | $ 945.00 | $ 49,140.00 | $ 49,140.00 |
| January 1, 2024 | July 3, 2024 | 26 | $ 31.50 | 60 | 40 | 20 | $ 47.25 | $ 47.25 | $ 945.00 | $ 24,840.00 | $ 24,840.00 |
| | | | | | | | | | **Total** | **$ 128,385.00** | **$ 128,385.00** |

Figure 18. Calculation of Unpaid Overtime for the Plaintiff Gonzales.

## PLAINTIFF AGUILAR BACKGROUND FACTS

122. Defendants hired Plaintiff Aguilar as a w2 non-exempt wage earner on March 14, 2022.

123. Plaintiff stopped working for Defendants on August 2, 2024.

124. Defendants hired Plaintiff Aguilar as a Handyman; he was responsible for electrical, mechanical, and plumbing-related repairs.

## WORK SCHEDULE HISTORY OF PLAINTIFF AGUILAR

125. From January 15, 2024, to July 3, 2024, Plaintiff Aguilar general work schedule was as follows:

| Day | Start Time | End Time | Total |
|---|---|---|---|
| Sunday | OFF | OFF | OFF |
| Monday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Tuesday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Wednesday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Thursday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Friday | 06:30 AM | 4:00 PM | 9.5 Hours |
| Saturday | OFF | OFF | OFF |
| | | **Total Hours** | **47.5 Hours** |

## FAILURE TO PROVIDE WAGE NOTICE TO PLAINTIFF AGUILAR

126. The New York State Department of Labor required the Defendants to provide Plaintiff Aguilar with wage notice within 10 days of his initial date of his employment that is equivalent or similar to the standard forms provided by the NYS DOL in Figure 19.

127. Withing ten (10) days of Plaintiff Aguilar first day of work, Defendant failed to provide Plaintiff Aguilar with a written notice in Plaintiff Aguilar's native language of Spanish containing the following information:

   i.   whether paid by the hour, shift, day, week, salary, piece, commission or other allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;
   ii.  the regular pay designated by the employer in accordance with NYLL §191;
   iii. the name of the employer;
   iv.  Any "doing business as" names used by the employer;
   v.   The physical address of the employer's main office or principal place of business and a mailing address, if different;
   vi.  The telephone number of the employer.



Figure 19. NY Department of Labor required wage notice.

## FAILURE TO PROVIDE PAYSTUBS TO PLAINTIFF AGUILAR

128. The New York State Department of Labor required the Defendants to provide Plaintiff Aguilar with a pay stub with each payment of wages set forth Plaintiff's hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages equivalent or similar to the standard forms provided by the NYS DOL in Figure 20.





Figure 20. NY Dept. of Labor Example Proper Paystub

129. The Defendants failed to provide Plaintiff Aguilar with an accurate statement of wages with each payment of wages that set forth Plaintiff Aguilar hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages.

130. Instead of providing a paystub each week, Defendants paid Plaintiff Aguilar by check. Throughout Plaintiff Aguilar employment, Defendants failed to provide him with pay stubs, as required by the New York State Labor Law as follows.

## PAY HISTORY OF PLAINTIFF AGUILAR

131. From March 14, 2022, to December 31, 2022., the Defendants paid Plaintiff Aguilar, as a Handyman, an hourly rate of 20.00 regardless of the hours he worked.

132. Between January 1, 2023, to December 31, 2023., the Defendants paid Plaintiff Aguilar, as a Handyman, an hourly rate of 23.00 regardless of the hours he worked.

133. From January 1, 2023, to August 2, 2024., the Defendants paid Plaintiff Aguilar, as a Handyman, an hourly rate of 24.00 regardless of the hours he worked.

## UNPAID OVERTIME CLAIMS OF PLAINTIFF AGUILAR

134. Defendants failed to pay Plaintiff an overtime premium equal to 1.5x the Plaintiff Aguilar's regular rate for all the hours worked over 40 per week.

135. Rather than paying Plaintiff Aguilar the required overtime premium of 1.5 times her regular hourly rate for hours worked more than 40 per week, Defendants compensated all hours, including overtime, at the standard straight-time rate.

136. Defendants owe Plaintiff Aguilar the difference between the regular hourly rate and the legally required overtime rate for all hours worked beyond 40 in a workweek.

137. Defendants engaged in this unlawful payment practice during Plaintiff Aguilar's whole tenure of employment.

138. As such, the Defendants failed to pay Plaintiff Aguilar $10,365,00 in unpaid overtime wage, as set forth in Figure 21.

| Period start | Period end | Weeks in period | Regular hourly rate | Average total hours worked per | Regular hours worked per week | Average overtime worked per week | Proper overtime rate per hour | Unpaid Overtime per hour | Unpaid overtime pay per week | Unpaid overtime in period | Total unpaid wages in period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| March 14, 2022 | December 31, 2022 | 42 | $ 20.00 | 60 | 40 | 20 | $ 30.00 | $ 30.00 | $ 600.00 | $ 25,028.57 | $ 25,028.57 |
| January 1, 2023 | December 31, 2023 | 52 | $ 23.00 | 60 | 40 | 20 | $ 34.50 | $ 34.50 | $ 690.00 | $ 35,880.00 | $ 35,880.00 |
| January 1, 2024 | August 2, 2024 | 31 | $ 24.00 | 60 | 40 | 20 | $ 36.00 | $ 36.00 | $ 720.00 | $ 22,011.43 | $ 22,011.43 |
| | | | | | | | | | Total | $ 82,920.00 | $ 82,920.00 |

Figure 21. Calculation of Unpaid Overtime for the Plaintiff Aguilar.

## PLAINTIFF CHOM

139. Defendants hired Plaintiff Chom as a w2 non-exempt wage earner on August 1, 2022.

140. Plaintiff stopped working for Defendants on July 23, 2024.

141. Defendants hired Plaintiff Chom as a Handyman. He was responsible for electrical, mechanical, and plumbing-related repairs

## WORK SCHEDULE HISTORY OF PLAINTIFF CHOM

142. From August 1, 2022, to July 23, 2024, Plaintiff Chom's general work schedule was working 11.5 hours a day, 5 days per week, Monday through Friday, for a total of 57.5 hours a week.

| Day | Start Time | End Time | Total |
|---|---|---|---|
| Sunday | Off | Off | Off |
| Monday | 06:30 AM | 6:00 PM | 11.5 hours |
| Tuesday | 06:30 AM | 6:00 PM | 11.5 hours |
| Wednesday | 06:30 AM | 6:00 PM | 11.5 hours |
| Thursday | 06:30 AM | 6:00 PM | 11.5 hours |
| Friday | 06:30 AM | 6:00 PM | 11.5 hours |
| Saturday | Off | Off | Off |
| | | Total hours | 57.5 hours |

## FAILURE TO PROVIDE WAGE NOTICE TO PLAINTIFF CHOM

143. The New York State Department of Labor required the Defendants to provide Plaintiff Chom with wage notice within 10 days of his initial date of his employment that is equivalent or similar to the standard forms provided by the NYS DOL in Figure 22.

144. Withing ten (10) days of Plaintiff's first day of work, Defendant failed to provide Plaintiff Chom with a written notice in Plaintiff Chom's native language of Spanish containing the following information:

    vii.    whether paid by the hour, shift, day, week, salary, piece, commission or other allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;

    viii.    the regular pay designated by the employer in accordance with NYLL §191;

    ix.    the name of the employer;

    x.    Any "doing business as" names used by the employer;

    xi.    The physical address of the employer's main office or principal place of business and a mailing address, if different;

    xii.    The telephone number of the employer.



Figure 22. NY Department of Labor required wage notice.

## FAILURE TO PROVIDE PAYSTUBS TO PLAINTIFF CHOM

145. The New York State Department of Labor required the Defendants to provide Plaintiff Chom with a pay stub with each payment of wages set forth Plaintiff Chom's hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any,

deductions, and net wages equivalent or similar to the standard forms provided by the NYS DOL in Figure 23.



Figure 23. NY Dept. of Labor Example Proper Paystub

146. The Defendants failed to provide Plaintiff Chom with an accurate statement of wages with each payment of wages that set forth Plaintiff Chom's hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages.

147. Instead of providing a paystub each week, Defendants paid Plaintiff Chom in cash for all hours worked. The cash was delivered directly by Defendants. Throughout Plaintiff Chom's employment, Defendants failed to provide him with pay stubs, as required by the New York State Labor Law as follows.

## PAY HISTORY OF PLAINTIFF CHOM

148. From August 1, 2022, to July 23, 2024., the Defendants paid Plaintiff Chom, as a Handyman, an hourly rate of 25.00 regardless of the hours he worked.

## UNPAID OVERTIME CLAIMS OF PLAINTIFF CHOM

149. Defendants failed to pay Plaintiff Chom an overtime premium equal to 1.5x the Plaintiff's regular rate for all the hours worked over 40 per week.

150. Rather than paying Plaintiff Chom the required overtime premium of 1.5 times her regular hourly rate for hours worked more than 40 per week, Defendants compensated all hours, including overtime, at the standard straight-time rate.

151. Defendants owe Plaintiff Chom the difference between the regular hourly rate and the legally required overtime rate for all hours worked beyond 40 in a workweek.

152. Defendants engaged in this unlawful payment practice during Plaintiff Chom's whole tenure of employment.

153. As such, the Defendants failed to pay Plaintiff Chom $24,880,00 in unpaid overtime wage, as set forth in Figure 24.

| Period start | Period end | Weeks in period | Regular hourly rate | Average total hours worked per | Regular hours worked per week | Average overtime worked per week | Proper overtime rate per hour | Unpaid Overtime per hour | Unpaid overtime pay per week | Unpaid overtime in period | Total unpaid wages in period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| August 1, 2022 | December 31, 2022 | 22 | $ 25.00 | 60 | 40 | 20 | $ 37.50 | $ 37.50 | $ 750.00 | $ 16,285.71 | $ 16,285.71 |
| January 1, 2023 | December 31, 2023 | 52 | $ 25.00 | 60 | 40 | 20 | $ 37.50 | $ 37.50 | $ 750.00 | $ 39,000.00 | $ 39,000.00 |
| January 1, 2024 | July 23, 2024 | 29 | $ 25.00 | 60 | 40 | 20 | $ 37.50 | $ 37.50 | $ 750.00 | $ 21,857.14 | $ 21,857.14 |
| | | | | | | | | | Total | $ 77,142.86 | $ 77,142.86 |

Figure 24. Calculation of Unpaid Overtime for the Plaintiff Chom.

## RETALIATION FACTS

154. During his employment, Plaintiff Chom consistently demonstrated exceptional diligence, fulfilling all assigned responsibilities with professionalism and maintaining positive relationships with colleagues. His reliable work ethic earned him the trust of Defendants, who entrusted him with numerous tasks and responsibilities over the course of more than two years. At no time during his tenure did Plaintiff Chom receive disciplinary action, reflecting his strong adherence to workplace policies and exemplary job performance.

155. On July 23, 2024, Plaintiff Chom was performing his regular duties alongside three coworkers, using pulleys to lift materials to the sixth floor. During this operation, Gabriel Perez (hereinafter "Mr. Gabriel"), a handyman employed at the same workplace, requested Plaintiff Chom's assistance with a separate task. Plaintiff Chom, who was actively managing the load being lifted, explained that interrupting the task would be unsafe due to the active use of the pulleys.

156. Unsatisfied with this response, Mr. Gabriel complained to his son, Angel Perez (hereinafter "Mr. Angel"), who was also Plaintiff Chom's supervisor. Mr. Gabriel alleged that Plaintiff Chom and his coworkers had refused to help him. Mr. Angel subsequently approached Plaintiff Chom and his team, issuing threats such as: "I am going to report you to Ms. Lucía, and you're going to regret crossing me and my father." At the time, Ms. Lucía, one of Plaintiff Chom's managers, was both Mr. Gabriel's niece and Mr. Angel's cousin.

157. Plaintiff Chom calmly defended himself and his coworkers, explaining that interrupting the task would have created safety risks. Mr. Angel, however, dismissed these

explanations, escalated the conflict by repeating his threats, and falsely accused Plaintiff Chom of attempting to physically harm Mr. Gabriel.

158. The confrontation continued as Mr. Angel began to harass and humiliate Plaintiff Chom, making degrading statements such as: "Remember who's in charge here. You are my bitches. You're paid to obey me, no matter what I say, even if I tell you to buy my lunch or clean up after me." Plaintiff Chom expressed his refusal to accept such degrading treatment. At this point, Mr. Gabriel threatened Plaintiff directly, saying, "If you keep this up, I'll break your face sooner or later." This marked the second time Mr. Gabriel had made such a threat; on June 23, 2024, he had similarly threatened Plaintiff during a disagreement about tools that Plaintiff was using for work.

159. Despite these escalating threats and harassment, Plaintiff Chom reported the incidents to management, including Ms. Lucía. However, no corrective action was taken, allowing the hostility to persist unchecked.

160. Later on July 23, 2024, following the confrontation, Plaintiff Chom received a text message from Ms. Lucía at 12:40 PM, instructing him to "Pick up your stuff and get back to your house on your own, leave now." The message was abrupt and provided no explanation. Plaintiff Chom attempted to call Ms. Lucía multiple times to discuss the matter, but she did not answer. (Ex. 2_ 2024.07.23_Text Message From Ms. Lucía to Plaintiff Chom.)

161. That same day, Plaintiff Chom sent a message to another manager, Mr. Willi, explaining the incident and raising concerns about the behavior of both Mr. Angel and Mr. Gabriel. However, neither Mr. Willi nor Ms. Lucía responded. (Ex. 3_2024.07.23_Text Message From Plaintiff Chom to Mr. Willi.)

162. On July 24, 2024, Plaintiff Chom visited Defendants' office to speak directly with Ms. Lucía and Mr. Willi. During the meeting, he reiterated that he and his coworkers had been unable to assist Mr. Gabriel because they were performing a time-sensitive and dangerous task. Ms. Lucía dismissed his explanation, accusing him of lying and falsely alleging that he had tried to harm Mr. Gabriel. Mr. Willi echoed her position, suggesting that Plaintiff had become complacent and insubordinate over time.

163. Following this meeting, Defendants' treatment of Plaintiff Chom worsened. They ceased all professional courtesies, reprimanded him over trivial matters, and significantly increased his workload compared to his peers. These retaliatory actions created an intolerable and hostile work environment.

164. On July 24, 2024, the cumulative impact of Defendants' conduct, including their failure to address Mr. Gabriel's threats of physical violence, the retaliation by Mr. Angel, and the dismissal of Plaintiff's legitimate workplace concerns, left Plaintiff with no reasonable option but to resign. His resignation was compelled by the hostile work

environment, escalating harassment, and the mental distress caused by Defendants' actions after Plaintiff asserted his rights to a safe and fair workplace.

## FIRST CAUSE OF ACTION
(Failure to Pay Overtime)
(FLSA, 29 U.S.C. § 207(a))
(Asserted by all Plaintiffs and on behalf of all situated FLSA Plaintiffs against all Defendants)

165. All allegations are hereby repeated, re-alleged and reincorporated as though fully set forth herein.

166. The provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(a), applied to the Defendants and protected the Plaintiffs while Plaintiffs worked for Defendants.

167. The FLSA prohibits an employer like the Defendants from failing to compensate employees like Plaintiffs for overtime hours worked at a rate of 1.5 times their regular hourly rate for all hours worked over forty (40) in a given workweek.

168. Defendants required Plaintiffs to work more than forty (40) hours per week but failed to pay Plaintiffs the legally mandated overtime premium.

169. By the Defendants' unlawful failure to pay overtime wages, they violated 29 U.S.C. § 207(a).

170. As a result of the unlawful conduct described herein, Plaintiffs suffered economic harm, including the loss of overtime wages owed to them under the law.

## SECOND CAUSE OF ACTION
(Failure to pay Overtime Wages)
(NY Lab. Law.  §652 et. seq.)
(Asserted by all Plaintiffs and on behalf of all situated FLSA Plaintiffs against all Defendants)

171. All allegations are hereby repeated, re-alleged and reincorporated as though fully set forth herein.

172. The overtime wage provisions of the NY Lab. Law §652 and its supporting regulations applied to Defendants and protected the Plaintiffs while Plaintiffs were employed by the Defendants.

173. NY Lab. Law §652 required employers to pay covered employees an overtime premium of 1.5 times the employee's regular hourly rate for all hours worked over 40 in a workweek.

174. As set forth herein, the Defendants failed to pay Plaintiffs overtime wages to which Plaintiffs were entitled under NY Lab. Law §652.

175. By Defendants' knowing or intentional failure to pay Plaintiffs overtime wages for overtime hours worked, they have willfully violated the New York Labor Law, and the supporting New York State Department of Labor Regulations.

176. Due to Defendants' violations of the New York Labor Law, Plaintiffs are entitled to recover unpaid overtime wages, liquidated damages, reasonable attorney's fees and costs of the action, and pre-judgment and post-judgment interest from Defendants.

### THIRD CAUSE OF ACTION
(Failure to pay wages)
NY Lab. Law §191
(Asserted by all Plaintiffs and on behalf of all situated FLSA Plaintiffs against all Defendants)

177. All allegations are hereby repeated, re-alleged and reincorporated as though fully set forth herein.

178. NY Lab. Law §191 covered the Defendants and protected the Plaintiffs while Plaintiffs were employed by the Defendants.

179. NY Lab. Law. §191 requires an employer to pay a manual worker within one week of the work performed.

180. As set forth herein, the Defendants, employers, failed to pay Plaintiffs all wages owed and still have not paid all wages owed to date.

181. Due to Defendants' violations of the New York Labor Law §191, Plaintiffs are entitled to recover unpaid overtime wages, liquidated damages, reasonable attorney's fees and costs of the action, and pre-judgment and post-judgment interest from the Defendants.

### FOURTH CAUSE OF ACTION
(Failure to provide paystub & wage notices)
(NY Lab. Law §198(1-b) & NY Lab. Law §198(1-d))
(Asserted by all Plaintiffs and on behalf of all situated FLSA Plaintiffs against all Defendants)

182. All allegations are hereby repeated, re-alleged and reincorporated as though fully set forth herein.

183. Pursuant to the Wage Theft Prevention Act, New York Labor Law, §195, Defendants willfully failed to furnish Plaintiffs with a required notice containing the following information:

     i.   the rates or rates of pay and basis thereof,

     ii.   whether paid by the hour, shift, day, week, salary, piece, commission or other allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;

     iii.   the regular pay designated by the employer in accordance with NYLL §191;

     iv.   the name of the employer;

     v.   Any "doing business as" names used by the employer;

     vi.   The physical address of the employer's main office or principal place of business, and a mailing address, if different;

     vii.   The telephone number of the employer

184. Defendants willfully failed to furnish Plaintiffs with an accurate statement of wages as required by NYLL §195(3), containing the dates of work covered by that payment of wages; name of the employee; name of the employer; address and phone number of employer; rate or rates of pay and basis thereof; whether paid by hour, shift, day, week, salary, piece, commission, or other; gross wages; hour rate or rates of pay, and overtime rates of pay; the number of hours worked, including overtime hours; deductions, allowances, and net wages.

185. Due to Defendants' violation of NYLL §195(1), Plaintiffs are entitled to recover from Defendants liquidated damages of $50 per each workday that the violation occurred, up to a maximum of $5,000, reasonable attorney fees, and costs and disbursements of this action, pursuant to NYLL § 198(1-b).

186. Defendants failed to provide Plaintiffs an accurate statement with each payment of wages that sets forth Plaintiffs' hours worked, rates of pay, gross wages, credits claimed (for tips, meals, and lodging), if any, deductions, and net wages.

187. Due to Defendants' violation of NYLL §195(3), Plaintiffs are entitled to recover from Defendants liquidated damages of $250 per each workday that the violation occurred, up to a maximum of $5,000, reasonable attorney fees, and costs and disbursements of this action, pursuant to NYLL § 198(1-d).

## **FIFTH CAUSE OF ACTION**
(Retaliation)
(NY Labor Law §215)
(Asserted by Plaintiff Chom against all Defendants)

188. All allegations are hereby repeated, re-alleged and reincorporated as though fully set forth herein.

189. The anti-retaliation protections of NY Lab. Law §215 and its supporting regulations apply to the Defendants and protected the Plaintiffs.

190. NY Lab. Law §215 prohibits employers from retaliating against an employee for engaging in activity protected under the NY Labor Law.

191. As set forth herein, Plaintiff Chom engaged in protected activity under NY Lab. Law §215.

192. As described herein, the Defendants retaliated against Plaintiff Chom when Defendants took an adverse employment action against Plaintiff Chom because the engaged in the protected activity.

193. By Defendants' knowing or intentional retaliation against Plaintiff Chom, the Defendants violated NYLL §215 and the supporting regulations.

194. Due to Defendants' violations, Plaintiff Chom is entitled to recover lost wages, compensatory damages, liquidated damages, emotional distress damages, punitive damages; reasonable attorney's fees, expenses, and the costs of the action; pre-judgment and post-judgment interest from the Defendants.

## SIXTH CAUSE OF ACTION
(Defamation – False Statements)
(Common Law Defamation – Slander and/or Libel)
(Asserted by Plaintiff Martinez, Plaintiff Chavez and Plaintiff Gonzales against all Defendants)

195. All allegations are hereby repeated, re-alleged, and reincorporated as though fully set forth herein.

196. The provisions of New York common law applied to the Defendants and protected Plaintiffs while they worked for Defendants.

197. New York common law prohibits an employer like Defendants from making false and defamatory statements about employees like Plaintiffs that harm their reputations or falsely accuse them of criminal conduct without evidence.

198. Defendants falsely accused Plaintiffs Martínez, Plaintiff Gonzales, Plaintiff Chávez, of stealing or diverting roofing sealant from a company project site.

199. Defendants made these false statements publicly during a meeting on July 3, 2024, and published them to other employees and managers without conducting any investigation or having any evidence to support their claims.

200. By making these false and defamatory statements, Defendants violated New York common law.

201. As a result of the unlawful conduct described herein, Plaintiffs suffered reputational harm, emotional distress, embarrassment, and diminished future employment opportunities.

202. As a result of the unlawful conduct described herein, Plaintiffs suffered harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs seeks all available remedies available under all causes of action listed herein in this Complaint and any and all remedies that the Court deems just and proper. Including but not limited to All lost wages and benefits, front pay, prejudgment, and post-judgment interest; liquidated damages, punitive damages, statutory penalties, emotional distress damages; recovery of reasonable costs, attorney fees, and expenses; equitable relief, and any other relief considered just and proper.

Dated: White Plains, New York
        January 10, 2025

EL-HAG & ASSOCIATES, P.C

_Jordan El-Hag_
Jordan El-Hag, Esq.
777 Westchester Ave, Suite 101
White Plains, N.Y, 10604
(914) 218-6190 (p)
(914) 206-4176 (f)
Jordan@elhaglaw.com
www.elhaglaw.com